JEROME TIMOTHY FORD, AKA JEROME FORD, APPEL-
LANT, *v*. THE STATE OF NEVADA, RESPONDENT.

No. 52272

September 29, 2011                                    262 P.3d 1123

*P. David Westbrook*, Las Vegas, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, *Steven S. Owens*, Chief Deputy District Attorney, and *Michael J. Watson*, Deputy District Attorney, Clark County, for Respondent.

---

Before the Court EN BANC.

## OPINION

By the Court, PICKERING, J.:

Jerome Ford appeals his conviction of pandering of prostitution, a felony. He contends that the statute under which he was convicted, NRS 201.300(1)(a), is unconstitutionally overbroad and vague. His challenge proceeds from a misinterpretation of the statute. NRS 201.300(1)(a) does not impose strict liability on a person who unintentionally causes another to engage in prostitution—say, the actress who romanticized prostitution in the movie *Pretty Woman*. It criminalizes the act of soliciting another person with the specific intent that, in response to the solicitation, she "become a prostitute" or "continue to engage in prostitution." *Id.*

Thus interpreted, NRS 201.300(1)(a) survives Ford's constitutional challenge. We also reject Ford's secondary argument that pandering cannot occur when the target is an undercover police officer who disavows having been or intending to become a prostitute. The jury instructions, however, did not adequately describe

the specific intent required for pandering. For this reason, we reverse and remand for a new trial.

## I.

Ford's conviction grows out of a sting operation that the Las Vegas Metropolitan Police Vice Squad conducted on the Las Vegas Strip. An undercover officer, Leesa Fazal, posed as a prostitute. Ford approached Fazal who, unknown to Ford, was wearing a wire under her skimpy dress. Captured on audiotape, the two discuss the fact that Fazal was "working"; that she'd been paid $300 for a 30-minute, "full service" date earlier that evening; that Ford had a "bi-coastal" escort service in Atlantic City and Las Vegas that he advertised (or planned to advertise) on yellowpages.com; and that with him, "You're going to make more than [$300 a date], that's my point. Believe what I'm telling you."[1] Not pulling any punches, Ford says, "I'm about making that mother fucking money, and make that mother fucking money do miracles."

As the conversation progressed, Ford described his business and the services he could offer Fazal. He told Fazal that he would take care of her, that he is the backbone of the business, and that he would protect her if a "trick" tried to attack her. Ford asked Fazal if she understood a pimp's role in her line of work. Ironically, he offered to instruct Fazal on how to properly interview a potential customer to determine if he was an undercover cop. He also offered Fazal practical advice: "As soon as you enter the room, you get your money . . . once everything is over and you don't got the money, then the trick has the advantage." When Fazal said she was working without a pimp, Ford encouraged her to work with him but warned her that if she did, she would have to obey his instructions because "it's a pimp's game." He said Fazal could make a lot of money if she stuck to his rules.

On appeal, Ford emphasizes that he did not ask Fazal for money, touch her, or arrange for her to have sex with anyone. He also stresses that Fazal did not decide to become a prostitute after they met and her trial testimony that she neither was nor ever would become one.

The State charged Ford with both pandering and attempted pandering. Ford contested probable cause in a pretrial petition for writ of habeas corpus that was denied. The jury convicted Ford of pandering, a category D felony. Ford was sentenced as a habitual criminal to 5 to 20 years in prison.

---

[1]The district court permitted Fazal and another officer to testify to the prostitution subculture and its vernacular. "Working" and "date" refer to prostitution, while "full service" refers to sexual intercourse and fellatio (on the same "date").

## II.

Ford's principal argument on appeal is that NRS 201.300(1)(a) criminalizes speech and innocent conduct and so is overbroad under the First Amendment and impermissibly vague under the Due Process Clauses of the Fifth and Fourteenth Amendments. "The overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)). The vagueness doctrine holds that "[a] conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Our review is de novo, *City of Las Vegas v. Dist. Ct. (Krampe)*, 122 Nev. 1041, 1048, 146 P.3d 240, 245 (2006), and Ford, as the proponent of the constitutional challenge, has the burden of establishing the statute's invalidity. *Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 509, 217 P.3d 546, 551 (2009).

## A.

The first step in both overbreadth and vagueness analysis is to construe the challenged statute. *Williams*, 553 U.S. at 293 ("it is impossible to determine whether a statute reaches too far without first knowing what the statute covers"); *Skilling v. United States*, 561 U.S. 358, 406 (2010) ("'[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague . . . . And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction.'" (alteration in original) (quoting *United States v. Harriss*, 347 U.S. 612, 618 (1954))); *State v. Castaneda*, 126 Nev. 478, 483, 245 P.3d 550, 553-54 (2010) ("Enough clarity to defeat a vagueness challenge may be supplied by judicial gloss on an otherwise uncertain statute, by giving a statute's words their well-settled and ordinarily understood meaning, and by looking to the common law definitions of the related term or offense." (citations and quotations omitted)).

Here, the challenged statute, NRS 201.300(1), reads as follows: "A person who: (a) Induces, persuades, encourages, inveigles, entices or *compels* a person to become a prostitute *or to continue to engage in prostitution* . . . is guilty of pandering." (Emphases added). Originally enacted in 1913, 1913 Nev. Stat., ch. 233, § 1, at 356, NRS 201.300(1)(a) has not changed significantly over the years, beyond its amendment in 1977 to add the words emphasized above. 1977 Nev. Stat., ch. 510, § 1, at 1054. "Prostitute" and "prostitution" are defined terms,[2] but the serial verbs "[i]nduces, persuades, encourages, inveigles, entices or compels," are not. Notably NRS 201.300(1)(a) does not specify the intent required for pandering. This is atypical of more modern criminal statutes, which often "employ words (usually adverbs) or phrases indicating some type of bad-mind requirement: 'intentionally' or 'with intent to . . .'; 'knowingly' or 'with knowledge that . . .'; 'purposely' or 'for the purpose of . . . ,'" and so on. 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.1(a), at 333 (2d ed. 2003) (alteration in original); *see* Model Penal Code § 2.02(2) (1985) (defining kinds of culpability).

Because NRS 201.300(1)(a) does not use any "bad-mind" adverbs or phrases, Ford takes the statute to impose strict liability based on cause and effect, not intent. By his account, NRS 201.300(1)(a) reaches not only the human trafficker who recruits teenage runaways for prostitution rings but also the following: The "over-protective mother, whose constant nagging and stern disapproval encourages her daughter to engage in prostitution as an act of rebellion; [t]he amorous 22-year-old male, steeped in the 'urban' culture popularized by rap artists and other media figures, who falsely represents himself as a 'pimp' or a 'player' in the hopes of enticing a woman to sleep with him"; and Julia Roberts, whose film *Pretty Woman* suggests that "wholesome and beautiful girls can use prostitution as a means to achieve wealth, see the world, and obtain the love of a dashing businessman like Richard Gere."

The intent, if any, required to be convicted of pandering under NRS 201.300(1)(a) lies at the heart of Ford's appeal. If he is right and NRS 201.300(1)(a) provides for strict liability, the statute is unsustainable. But Ford misinterprets the statute. To be convicted

---

[2]NRS 201.295(3) states that " 'Prostitute' means a male or female person who for a fee engages in sexual intercourse, oral-genital contact or any touching of the sexual organs or other intimate parts of a person for the purpose of arousing or gratifying the sexual desire of either person." " 'Prostitution' means engaging in sexual conduct for a fee," NRS 201.295(4), while " '[s]exual conduct' means any of the acts enumerated in" the definition of prostitute. NRS 201.295(5).

of pandering under NRS 201.300(1)(a), a defendant must act with the specific intent of inducing (or persuading, encouraging, inveigling, enticing, or compelling) his target to become or remain a prostitute. A number of factors lead us to this conclusion.

First, Ford makes too much of NRS 201.300(1)(a)'s omission of a stated intent requirement. "While strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements," they occupy a "generally disfavored status" and "[c]ertainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement." *United States v. United States Gypsum Co.*, 438 U.S. 422, 437-38 (1978); *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("mere omission . . . of intent [in a criminal statute] will not be construed as eliminating that element from the crimes denounced"); *see United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994) (many "cases interpret[ ] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them").

In *Sharma v. State*, 118 Nev. 648, 652-55, 56 P.3d 868, 870-72 (2002), we addressed the intent required for liability under another Nevada criminal statute, NRS 195.020, that, like NRS 201.300(1)(a), was enacted in the early twentieth century, Crimes and Punishments Act of 1911 § 9, *reprinted in* Nev. Rev. Laws § 6274 (1912), and does not specify an intent requirement. Using words similar to those in NRS 201.300(1)(a), NRS 195.020 provides that every person concerned in the commission of a crime is liable as a principal, whether he or she commits the act constituting the offense, aids or abets in its commission, or "counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor." Even though NRS 195.020 does not state an intent requirement, in *Sharma* we interpreted it to require that the aider and abettor "knowingly aid[ ] the other person *with the intent that the other person commit the charged crime.*" 118 Nev. at 655, 56 P.3d at 872 (emphasis added). *See Robey v. State*, 96 Nev. 459, 461, 611 P.2d 209, 210 (1980) ("the general conditions of penal liability requir[e] not only the doing of some act by the person to be held liable, but also the existence of a guilty mind during the commission of the act" (citing *Morissette*, 342 U.S. 246)).

We therefore reject Ford's argument that NRS 201.300(1)(a)'s omission of a stated intent requirement automatically means that it provides for strict criminal liability.

Second, NRS 201.300(1)(a)'s history and apparent purpose support reading it to require specific intent of persuading the target to become or remain a prostitute.

The Nevada Legislature passed NRS 201.300(1)(a) three years after Congress passed the Mann Act, then popularly known as the "White-Slave Traffic Act," 36 Stat., §§ 1-8, at 825, 825-27 (1910) (codified as amended at 18 U.S.C. §§ 2421 et seq.). Using words like those in NRS 201.300(1)(a), section 3 of the Mann Act prohibited "knowingly persuad[ing], induc[ing], entic[ing], or coerc[ing] . . . any woman or girl to go from one place to another in interstate or foreign commerce . . . for the purpose of prostitution or debauchery, or for any other immoral purpose."[3] Laws modeled on the Mann Act swept the country in the early 1900s in response to what historians describe as "intense, widespread, and often hysterical" concern with coerced prostitution. Mark Thomas Connelly, *The Response to Prostitution in the Progressive Era* 115 (1980). *See* Peter C. Hennigan, *Property War: Prostitution, Red-Light Districts, and the Transformation of Public Nuisance Law in the Progressive Era*, 16 Yale J.L. & Human. 123, 157 (2004) ("Beginning in the early 1900s, America awoke to a startling new threat: the 'existence' of an international conspiracy to seduce, entrap and ultimately enslave (white) American girls into a life of prostitution."). The desire to protect women from coerced prostitution that drove these laws led to "a discursive reconceptualization of the prostitute within American society, [from] 'fallen woman'— perhaps deserving of sympathy, but ultimately responsible for her position in life on account of her lax morals . . .—[to] 'white slave'—an innocent, agency-less, pre-sexual (country) girl who had been tricked into a life of prostitution by urban panders." *Id.* at 126. Consistent with these concerns, the Mann Act focuses on

---

[3]That Nevada did not include the "for the purpose of" phrasing is not surprising. While the omission arguably suggests that Nevada meant to dispense with the specific intent required by the Mann Act, § 3, it seems more reasonable to take Nevada's version as reworking the federal statute's language to eliminate its interstate travel/Commerce Clause component.

Congress modernized the Mann Act in 1986 and revised its text again in the Telecommunications Act of 1996. *See* Andriy Pazuniak, *A Better Way to Stop Online Predators: Encouraging a More Appealing Approach to § 2422*, 40 Seton Hall L. Rev. 691, 694-98 (2010). Other states have similarly revised their dated prostitution and pandering laws to remove "obsolete language," to replace "archaic language" with "modern terminology," and to streamline them. *State v. Grazian*, 164 P.3d 790, 794-95 (Idaho 2007); *see also* Model Penal Code § 251.2 (1980). Nevada has added to, but not meaningfully pruned, its prostitution and pandering laws; with brothels being permitted in certain counties at local government option, this thicket of laws has led to litigation and uncertainty. *Coyote Pub., Inc. v. Miller*, 598 F.3d 592 (9th Cir. 2010), *reversing Coyote Pub., Inc. v. Heller*, No. CV-06-329-JCM-PAL, 2007 WL 2254702 (D. Nev. Aug. 3, 2007); *see* Daria Snadowsky, *The Best Little Whorehouse Is Not in Texas: How Nevada's Prostitution Laws Serve Public Policy, and How Those Laws May Be Improved*, 6 Nev. L.J. 217 (2005) (Winner, William S. Boyd School of Law Excellence in Writing Award 2004-05).

the defendant's intent to prostitute the victim, not whether the prostitution actually occurs. *See United States v. Rashkovski*, 301 F.3d 1133, 1137 (9th Cir. 2002) (citing *Simpson v. United States*, 245 F. 278, 279 (9th Cir. 1917)).

Similarly, our case law recognizes that the "primary emphasis" of NRS 201.300(1)(a) is "upon the recruitment of females into the practice of prostitution." *Stanifer v. State*, 109 Nev. 304, 308, 849 P.2d 282, 285 (1993). " '[A] "pimp" solicits patrons for the prostitute and lives off her earnings, while a "panderer" recruits prostitutes and sets them up in business.' " *Id.* (alteration in original) (quoting 2 *Wharton's Criminal Law* § 274 (14th ed. 1979)); *see also* 2 Charles E. Torcia, *Wharton's Criminal Law* § 266, at 637 (15th ed. 1994) ("The life-blood of prostitution is not the prostitute but the parasite who 'promotes' prostitution. It is the promoter who makes prostitution a going business; therefore, his activity is usually punished more severely than prostitution itself."). The panderer's target is seen as the victim of the crime, not a co-conspirator. "The gist of the offense is . . . the spread of prostitution, and whether the female becomes debauched or not is unimportant in view of the emphasis on punishing the promotion and expansion of the vicious evil." *Commonwealth v. Stingel*, 40 A.2d 140, 142 (Pa. Super. Ct. 1944) (interpreting Pennsylvania statute almost identical to NRS 201.300(1)(a)).

To read NRS 201.300(1)(a) as imposing strict liability would shift the crime's focus from the panderer's efforts to recruit prostitutes to the success of the recruiting program—liability would depend not on what the panderer intended to achieve but the effect he caused, intended or not, which is counterintuitive.

Also significant: From the date of its original enactment until 2005, NRS 201.300(1)(a) had a companion statute providing that, "[u]pon a trial for . . . inveigling, enticing or taking away any [person] *for the purpose of prostitution*," corroboration of the targeted person's testimony was required. Nev. Rev. Laws § 7177 (1912) (emphasis added); *see* Nev. Compiled Laws § 10975 (1929); 1967 Nev. Stat., ch. 523, § 447, at 1472; 1981 Nev. Stat., ch. 504, § 1, at 1029; 2005 Nev. Stat., ch. 113, § 1, at 308 (repealing corroboration requirement as to pandering). The words "for the purpose of prostitution" in NRS 201.300(1)(a)'s companion statute confirms that it is fair to read NRS 201.300(1)(a) as requiring specific intent.

Third, the statute's language supports, if it does not compel, a specific intent requirement, "and there is no grammatical barrier to reading it that way." *United States v. Williams*, 553 U.S. 285, 294 (2008). Although a "statute may contain no adverbs or phrases indicating a requirement of fault, some fault may be inherent in a verb . . . the statute employs (*e.g.*, whoever 're-fuses' to do something or 'permits' another to do something)." 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.1(a)(1), at 333

(2d ed. 2003). The verbs that NRS 201.300(1)(a) strings together are active; they contemplate that the subject of the sentence act with the specific purpose that his object do what he asks. Thus, *Black's Law Dictionary* defines "persuade" as "[t]o induce (another) to do something"; "encourage" as "[t]o instigate; to incite to action; to embolden; to help"; "inveigle" as "[t]o lure or entice through deceit or insincerity < she blamed her friend for inveigling her into making the investment>"; "entice" as "[t]o lure or induce; esp., to wrongfully solicit (a person) to do something"; and "compel" as "1. To cause or bring about by force, threats, or overwhelming pressure."[4] *Id.* at 1260, 607, 901, 611, 321 (9th ed. 2009).

Fourth, while the statutory formulations vary from state to state, none of the cases interpreting these statutes treats pandering (or "promoting prostitution," as some places call it) as anything other than a specific intent crime. As the California Supreme Court recently held:

> We clarify here that *pandering is a specific intent crime*. Its commission requires that a defendant intends to persuade or otherwise influence the target "to become [or remain] a prostitute." This . . . effectuates the purpose and intent of the pandering statute, which is to criminalize the *knowing and purposeful* conduct of any person seeking to encourage another person to work with the panderer or another pimp in plying the prostitution trade.

*People v. Zambia*, 254 P.3d 965, 974 (Cal. 2011) (first emphasis added) (quoting Cal. Penal Code § 266i(a)(2)).[5] Construing a

---

[4]Oddly, *Black's* does not define "induce." It has been defined elsewhere to mean: "1. To lead (a person), by persuasion or some influence or motive that acts upon the will, to (into unto) some action, condition, belief, etc.; to lead on, move, influence, prevail upon (any one) *to do* something." *Oxford English Dictionary*, vol. VII, at 887 (2d ed. (with corrections) 1998).

[5]The California statute at issue in *Zambia*, like NRS 201.300(1)(a), is silent as to the intent required for pandering of prostitution. But the two states' pandering statutes differ in several respects. First, Nevada's is broader in that it proscribes efforts to persuade or otherwise influence a person "to become a prostitute *or to continue to engage in prostitution*," NRS 201.300(1)(a) (emphasis added), while California's lacks the above-emphasized language, Cal. Penal Code § 266i(a)(2) (West 2008), obviating the issue that divided the *Zambia* court. Second, the California statute penalizes a person who "[b]*y promises, threats, violence, or by any device or scheme*, causes, induces, persuades, or encourages another person to become a prostitute." *Id.* (emphasis added). Although the string of verbs differs slightly in each statute (Nevada adds "compels," "entices," and "inveigles" and omits "causes"), the more significant difference is that Nevada's statute lacks the emphasized language, "by promises, threats, violence, or by any device or scheme." This language strengthens the foundation for the *Zambia* court's specific intent holding. For the reasons expressed in the text, however, its absence doesn't affect our decision.

statute almost identical to Nevada's, Michigan has likewise acknowledged that specific intent is required for pandering. *See People v. Morey*, 583 N.W.2d 907, 911 (Mich. Ct. App. 1998) (finding error in a portion of the trial court's pandering instruction but not questioning its statement that pandering "is a specific intent crime, which means that the prosecution must prove not only that the defendant did the acts but that she did the acts with the intent to cause a particular result," to wit: that the target "become a prostitute"); *People v. Rocha*, 312 N.W.2d 657, 664 (Mich. Ct. App. 1981) ("The jurors were required to find that defendant knowingly and intentionally, for the purpose of prostitution, was inducing, persuading, encouraging, enticing or inveigling a female person to become a prostitute."). *See also Bell v. State*, 668 P.2d 829, 833 (Alaska Ct. App. 1983) (jury instruction required that the defendant have "the specific intent to cause or induce [D.W.] to engage in prostitution"); *State v. Rodgers*, 655 P.2d 1348, 1357 (Ariz. Ct. App. 1982) (jury instruction required that the "crime of pandering requires proof that the defendant knowingly compelled, induced or encouraged another to lead a life of prostitution"); *Floyd v. State*, 575 S.W.2d 21, 24 (Tex. Crim. App. 1978) (construing "prostitution enterprise" as requiring an "immediate objective to promote prostitution as a particular field of endeavor"; "passive knowledge of the surrounding circumstances" will not do); Model Penal Code § 251.2(2)(c) (1980) (providing that a person who "knowingly promotes prostitution" may be held criminally liable for "encouraging, inducing or otherwise purposely causing another to become or remain a prostitute").[6]

Fifth, and finally, courts take "particular care . . . to avoid construing a statute to dispense with mens rea where doing so would 'criminalize a broad range of apparently innocent conduct.'" *Staples v. United States*, 511 U.S. 600, 610 (1994) (quoting *Liparota v. United States*, 471 U.S. 419, 426 (1985)). Ford's examples of the overprotective mother, the young man looking for love, and movie star Julia Roberts convince us that reading NRS 201.300(1)(a) as not requiring specific intent would do just that: Criminalize innocent conduct and, at the same time, cast the

---

[6]In *Glegola v. State*, 110 Nev. 344, 871 P.2d 950 (1994), we interpreted NRS 201.358(1), which prohibits prostitution or solicitation for prostitution after testing positive for AIDS to create a *general* intent offense, not requiring for its commission that the act of prostitution actually occur or even be intended (Glegola planned a "trick roll"). The substantial public health risk involved, the difficulty in disproving a "trick roll" defense, and the statute's language justify the holding in *Glegola* but do not support its extension to pandering.

statute into constitutional doubt under the First Amendment and the due process principles articulated in *Flamingo Paradise Gaming v. Attorney General*, 125 Nev. 502, 514, 217 P.3d 546, 554-55 (2009), and *Robey v. State*, 96 Nev. 459, 461, 611 P.2d 209, 210 (1980). "[W]hen the language of a statute admits of two constructions, one of which would render it constitutional and valid and the other unconstitutional and void, that construction should be adopted which will save the statute." *Virginia and Truckee R.R. Co. v. Henry*, 8 Nev. 165, 174 (1873).

### B.

The next question is whether NRS 201.300(1)(a), as construed, criminalizes a substantial amount of protected expressive activity and thus falls to the First Amendment overbreadth doctrine. We conclude that it does not.

As Ford notes, NRS 201.300(1)(a) permits conviction based on speech. But "[m]any long established criminal proscriptions— such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298. "Although First Amendment speech protections are far-reaching, there are limits. Speech integral to criminal conduct, such as fighting words, threats, and solicitations, remain categorically outside its protection." *United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010).

Pandering is a type of criminal solicitation. "In the case of a criminal solicitation, the speech—asking another to commit a crime—is the punishable act." *Id.* (also noting that "[s]olicitation is an inchoate crime; the crime is complete once the words are spoken with the requisite intent"). But the specific intent required—that the panderer's target become or remain a prostitute— narrows the statute to illegal employment proposals. There is no First Amendment right to pander where prostitution is illegal, as it is in Clark County. *State v. Johnson*, 324 N.W.2d 447, 450 (Wis. Ct. App. 1982) (rejecting overbreadth challenge to Wisconsin's pandering statute because "[o]n its face [it] is directed at speakers who intentionally propose an illegal commercial transaction, and, thus, it does not, in general, implicate speech protected by the first amendment"); *see Allen v. Stratton*, 428 F. Supp. 2d 1064, 1071-72 (C.D. Cal. 2006) (rejecting overbreadth challenge to California's pandering statute). "Offers to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297.

Ford argues that NRS 201.300(1)(a) permits conviction of persons who do not harbor the requisite specific intent—maybe his words just involved showing off, or lying, or simply recruiting Fazal for his legitimate escort service. But that is "a dispute over the meaning and inferences that can be drawn from the facts" in an individual case, *White*, 610 F.3d at 962; it does not establish overbreadth.

More troubling is Ford's argument that NRS 201.300(1)(a) may inhibit the abstract advocacy of career prostitution. As construed, however, the statute requires that the defendant target another person with the specific, subjective intent of persuading him or her to become or remain a prostitute. Thus, NRS 201.300(1)(a) does not prohibit abstract advocacy of prostitution; it forbids efforts to recruit a targeted person to work as a prostitute. To invalidate a statute on First Amendment grounds at the behest of one whose conduct it permissibly forbids, the statute must be "*substantially* overbroad." *Williams*, 553 U.S. at 303. Ford has not made that showing here. *See Johnson*, 324 N.W.2d at 450 (rejecting similar overbreadth challenge to a pandering law on this basis).[7]

Finally, a panderer recruits a person for employment as a prostitute, and employment proposals are a species of commercial speech. "[I]t is irrelevant whether [NRS 201.300(1)(a)] has an overbroad scope encompassing protected commercial speech of other persons, *because the overbreadth doctrine does not apply to commercial speech.*" *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 496-97 (1982) (emphasis added).

## C.

Ford makes two distinct vagueness arguments. Citing *Silvar v. District Court*, 122 Nev. 289, 129 P.3d 682 (2006), he argues,

---

[7]Of note, NRS 201.354 provides that "[i]t is unlawful for any person to engage in prostitution or solicitation therefor, *except in a licensed house of prostitution.*" (Emphasis added.) Ford's encounter with Fazal occurred in a Las Vegas casino in Clark County, where all prostitution is illegal, given NRS 244.345(8), which, as amended in 2011, prohibits licensing houses of prostitution in counties with populations of more than 700,000. Despite reference in a footnote in his reply brief to brothels being legal in parts of Nevada, Ford does not address NRS 201.300(1)(a)'s application in counties where, at least in a licensed house of prostitution, prostitution is legal. Whether and, if so, how NRS 201.300(1)(a) applies to conduct that occurs in the context of a legal brothel is thus a question we leave for another day. In doing so we note that other more specific statutes address brothel recruitment and operation. NRS 201.360 (addressing crimes associated with placing a person in a house of prostitution); *see* NRS 201.310 (placing one's spouse in a brothel); NRS 201.330 (detaining a person in a brothel because of debt contracted while living there).

first, that NRS 201.300(1)(a) criminalizes conduct based on the effect it has on others and, thus, is inherently (and unconstitutionally) indeterminate. Second, he argues that the statute's failure to define its operative verbs leaves too much to guesswork to satisfy due process. *See Flamingo Paradise Gaming*, 125 Nev. at 512-13, 217 P.2d at 553-54 (convicting a defendant under a criminal law that fails to define key terms that lack plain meaning violates due process).

As we have construed NRS 201.300(1)(a), the defendant must have the specific intent that his target become or remain a prostitute. This requirement of specific subjective intent dispositively distinguishes NRS 201.300(1)(a) from the loitering ordinance struck down in *Silvar* and the antismoking statute considered in *Flamingo Paradise Gaming*.

The ordinance in *Silvar* made it a crime "to loiter . . . *in a manner and under circumstances manifesting the purpose of* inducing, enticing, soliciting for or procuring another to commit an act of prostitution." Clark County Ordinance § 12.08.030 (2006), *reprinted in Silvar*, 122 Nev. at 292, 129 P.3d at 684 (emphasis added). We interpreted this ordinance as penalizing the defendant's loitering based on what a hypothetical viewer saw its purpose as being, not what the defendant subjectively intended. *Silvar*, 122 Nev. at 294, 129 P.3d at 685. Did the defendant's loitering demeanor "manifest" a prohibited purpose? The loiterer could not know this until his loitering style was rated by others and, even then, what one viewer might take as "manifesting the purpose" another, less suspicious or more naive viewer might not. *Id.* Thus construed, the ordinance "tied criminal culpability to . . . untethered subjective judgments . . . [such as] whether the defendant's conduct was 'annoying' or 'indecent' " based on how a defendant appears to a third party. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20-21 (2010); *see City of Las Vegas v. Dist. Ct.*, 118 Nev. 859, 865, 59 P.3d 477, 482 (2002), *abrogated on other grounds by State v. Castaneda*, 126 Nev. 478, 482 n.1, 345 P.3d 550, 553 n.1 (2010).

By contrast, NRS 201.300(1)(a) requires that the defendant actually intend to produce the prohibited result. As we recognized in *City of Las Vegas v. District Court (Krampe)*, 122 Nev. 1041, 1051, 146 P.3d 240, 247 (2006), a law that requires specific intent to produce a prohibited result may avoid vagueness, both by giving the defendant notice of what is prohibited and by affording adequate law enforcement standards. *See Hoffman Estates*, 455 U.S. at 499 ("a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice"). To be sure, conviction depends on a jury deciding whether the defendant harbored the prohibited intent. But this is a "clear question[ ] of fact. Whether someone held a belief or had an intent is a true-or-false determination, not a subjective judgment such as

whether conduct is 'annoying . . . .'" *Williams*, 553 U.S. at 306. That "close cases can be envisioned" does not render a statute void for vagueness, *id.* at 305; that problem "is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Id.* at 306.

Nor does the failure to define its operative verbs render NRS 201.300(1)(a) unconstitutionally vague. As discussed in the text accompanying note 4, *supra*, the words "[i]nduces, persuades, encourages, inveigles, entices or compels" all carry ordinary dictionary definitions. Like "[t]he words 'attempt,' 'persuade,' 'induce,' 'entice' or 'coerce' [in 18 U.S.C. § 2422(b), formerly Mann Act, § 3]," these "are words of common usage that have plain and ordinary meanings . . . sufficiently definite that ordinary people using common sense could grasp the nature of the prohibited conduct." *United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007); *United States v. Hart*, 635 F.3d 850, 857 (6th Cir. 2011) (the failure to define "persuade" does not render 18 U.S.C. § 2422(b) void for vagueness; the word has " 'a plain and ordinary meaning that does not need further technical explanation' " and is " 'sufficiently precise to give a person of ordinary intelligence fair notice as to what is permitted and what is prohibited and to prevent arbitrary and discriminatory enforcement.' " (quoting *United States v. Tykarsky*, 446 F.3d 458, 473 (3d Cir. 2006))).[8]

NRS 201.300(a)(1) prohibits a person from enticing another to become or remain a prostitute, a defined term. *See supra* note 2. Because NRS 201.300(1)(a) requires the defendant to act with the specific intent to induce, persuade, encourage, inveigle, entice, or compel another to become or remain a prostitute—and the defendant is subject to penalty for his acts and his intentions, not those of a third party that he may or may not be able to control, *cf. Flamingo Paradise Gaming*, 125 Nev. at 514, 217 P.3d at 554-55 (invalidating statute that outlawed smoking in restricted areas but did not specify the obligation it imposed on business owners or employees)—we cannot say that it fails to give adequate notice of the conduct it prohibits or gives law enforcement such standardless

---

[8]NRS 201.300(1)(a)'s substitution of "compels" for "coerces" and addition of "encourages" and "inveigles" does not distinguish Ford's vagueness challenge from the unsuccessful challenges to 18 U.S.C. § 2422(b) in *Gagliardi*, *Hart*, and *Tykarsky*, particularly given our long adherence to the doctrine of *noscitur a sociis* (words are known by—acquire meaning from—the company they keep). *Orr Ditch Co. v. Dist. Ct.*, 64 Nev. 138, 146, 178 P.2d 558, 562 (1947). The argument that "encourages" does not require an object ignores its transitive use in NRS 201.300(1)(a)—("encourages . . . a person . . . to become . . . or to continue"); its meaning, moreover, is distinct from "persuades" in that it encompasses situations in which the panderer's persuasive efforts fail. *See People v. Bradshaw*, 107 Cal. Rptr. 256, 258 (Ct. App. 1973).

discretion that it "authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. Ford's vagueness challenge therefore fails. *See also Guzzardo v. Bengston*, 643 F.2d 1300, 1303-04 (7th Cir. 1981) (rejecting vagueness challenge to Illinois pandering statute; the term " 'arrange a situation in which a female may practice prostitution' evokes a rather clear image of what the legislature had in mind when the statute was enacted''); *State v. Lee*, 315 N.W.2d 60, 62 & n.1 (Iowa 1982) (upholding Iowa pandering statute against vagueness challenge because ''the terms 'persuades' and 'arranges' are common words that are easily defined. The statute gives fair warning that it prohibits affirmative acts designed to orchestrate for or induce another to practice prostitution.'') (collecting cases).

III.

Ford offers a secondary, statutory argument. Whatever his intent and actions were, Ford argues, he could not violate NRS 201.300(1)(a) because his target, police officer Leesa Fazal, testified she would never ''become a prostitute'' and, never having been a prostitute, could not ''continue to engage in prostitution.'' In his view, NRS 201.300(1)(a) does not apply when the target is an undercover police officer. Alternatively, but for much the same reasons, Ford argues that the most he can be liable for is attempted pandering, not pandering.

Ford conflates pandering, which is an inchoate crime of solicitation, with prostitution itself. ''[I]t is the defendant's intent that forms the basis for his criminal liability, not the victims'.'' *United States v. Rashkovski*, 301 F.3d 1133, 1137 (2002) (upholding conviction under 18 U.S.C. § 2422(a), formerly Mann Act § 3, against the argument that the defendant ''could not have induced or enticed the [Russian] women [he targeted] to travel 'to engage in prostitution' under § 2422(a) because [they] both declared on the stand that they had no intention of working as prostitutes once they reached the United States''). And the crime of pandering is complete based on the defendant's act of soliciting his target ''to become a prostitute'' or ''to continue to engage in prostitution.'' NRS 201.300(1)(a). Its commission does not require that the defendant's persuasion succeed:

> Under our statute the crime is complete when a person ''encourages a female person to become a prostitute.'' Success is not a necessary component of the crime. . . . It is the act of encouragement, persuasion or inveiglement which is forbidden.

*State v. Gates*, 221 P.2d 878, 880 (Utah 1950); *State v. Clark*, 406 N.W.2d 802, 805 (Iowa Ct. App. 1987) ("It is the recruiting and management activity, and not its success, which is the evil sought to be prohibited under a pandering statute.").

A variant of the police-officer-as-target issue came before the California Supreme Court in *People v. Zambia*, 254 P.3d 965 (Cal. 2011). There, as here, the target of the defendant's attentions was an undercover police officer posing as a prostitute, whom the defendant allegedly recruited to come to work for him. *Id.* This led the defendant in *Zambia* to argue, among other things, that "he could not be convicted of anything more than attempted pandering because there was no possibility that Officer Cruz would become a prostitute." *Id.* at 975 n.8. The court rejected the argument:

> the crime of pandering is complete when the defendant "encourages another person to become a prostitute" . . . . There is no requirement that defendant succeed. Nor is there a requirement that, in selecting his targets, the panderer choose only those who present a high probability of success. Again, the focus is on the actions and intent of the panderer, not the target.

*Id.* (citation omitted). Nor is it a defense that Ford thought Fazal was a prostitute when she was not. *See* 2 LaFave, *supra*, § 11.1(d) ("it is *not* a defense to a solicitation[-type crime] that, unknown to the solicitor, the person solicited could not commit the crime. The defendant's culpability is to be measured by the circumstances as he believes them to be."); *Williams*, 553 U.S. at 300 ("As with other inchoate crimes—attempt and conspiracy, for example—impossibility of completing the crime because the facts were not as the defendant believed is not a defense[ ].").

Further confirming that NRS 201.300(1)(a) applies to undercover sting operations is NRS 175.301, which, until 2005, 2005 Nev. Stat., ch. 113, § 1, at 308, required corroboration to convict a person of pandering. After this court reversed a pandering conviction under NRS 201.300, holding that one police officer could not corroborate another's testimony, *Sheriff v. Hilliard*, 96 Nev. 345, 608 P.2d 1111 (1980), the Legislature amended NRS 175.301(2) to add an exception to the corroboration requirement when "[t]he person giving the testimony is, and was at the time the crime is alleged to have taken place, a police officer or deputy sheriff who was performing his duties as such." 1981 Nev. Stat., ch. 504, § 1, at 1029. Although the 2005 Legislature omitted pandering from NRS 175.301's corroboration requirement altogether, its quarter-century of dispensing with corroboration in pandering cases involving undercover police officer testimony cements our conclusion that NRS 201.300(1)(a) applies to undercover sting operations.

Indeed, as Ford but not his counsel argued in the district court, no facts appear to support giving an instruction on attempted pandering in this case. As a species of solicitation, the crime of attempted pandering would occur if an actor's message were uttered but didn't reach the intended target (assuming there was enough, otherwise, for the crime). 2 LaFave, *supra* § 11.1(c) ("What if the solicitor's message never reaches the person intended to be solicited, as where an intermediary fails to pass on the communication or the solicitor's letter is intercepted before it reaches the addressee? The act is nonetheless criminal, although it may be that the solicitor must be prosecuted for an attempt to solicit on such facts."); *see* NRS 193.330 (attempt exists when "[a]n act done with the intent to commit a crime, and *tending but failing* to accomplish it . . ." (emphasis added)). But there are no facts like that here. Ford's message reached Fazal. The question is not whether he attempted to pander, but whether his words and conduct constitute the completed specific intent crime of pandering.[9]

## IV.

To combat Ford's constitutional challenges, the State readily concedes—in fact, affirmatively argues—that NRS 201.300(1)(a) requires specific intent. We agree, but the jury was not so instructed. The instructions the jury received simply reprised the requirements for general intent under NRS 193.190 (there must be "a union, or joint operation of act and intention" for "every crime or public offense") and NRS 201.300(1)(a)'s text. Even more confusing, the general intent instruction also addressed motive and admonished the jury that "[m]otive is not an element of the crime charged and the State is not required to prove a motive on the part of the Defendant in order to convict." Combined with the lack of an instruction on specific intent, these instructions created the misimpression that Ford could be convicted based simply on a showing that he intended to speak the words he did, rather than that he spoke them specifically intending to persuade Fazal

---

[9]We decline to address Ford's equal protection challenge, which depends on matters not part of the record in the district court, and his objection on appeal to the use of a transcript to the admission of which he stipulated in the district court. As for the district court's admission of expert testimony concerning the pimping and prostitution culture and its code words, on the record presented we find no abuse of discretion, *see Stanifer v. State*, 109 Nev. 304, 306 n.1, 849 P.2d 282, 283 n.1 (1993), but caution that there are risks associated with and limits to the permissible use of such expert testimony. *See United States v. York*, 572 F.3d 415, 418-27 (7th Cir. 2009). We also reject Ford's argument that using his words to convict him violates the corpus delicti rule stated in *Hooker v. Sheriff*, 89 Nev. 89, 506 P.2d 1262 (1973), and thereby due process. *Hooker* addresses post-crime admissions or confessions, not crimes like pandering that target illegal solicitations.

"to become a prostitute" or "to continue to engage in prostitution." Although Ford did not object to the failure to instruct on specific intent, the error was plain, and the failure to give a specific intent instruction affected Ford's substantial rights. *See, e.g.*, *People v. Hill*, 163 Cal. Rptr. 99, 108 (Ct. App. 1980) (reversing pandering conviction because the jury was not instructed on specific intent). For this reason, we reverse and remand for a new trial.

SAITTA, C.J., and DOUGLAS, CHERRY, GIBBONS, HARDESTY, and PARRAGUIRRE, JJ., concur.